IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Crystal Wendy Coley, ) | |
| ) | Civil Action No. 6:14-1702-JMC-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

   This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a)(D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

   The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

   The plaintiff filed an application for disability insurance benefits ("DIB") on February 4, 2011, and an application for supplemental security income ("SSI") benefits on July 19, 2012. In both applications, she alleged that she became unable to work on February 1, 2011. The applications were denied initially and on reconsideration by the Social Security Administration. On December 12, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff Robert E. Brabham, Jr., an

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

impartial vocational expert, appeared on December 14, 2012, considered the case *de novo*, and on January 4, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on February 24, 2014. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)   The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.
>
> (2)   The claimant has not engaged in substantial gainful activity since February 1, 2011, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)   The claimant has the following severe impairments: degenerative disc disease, lumbar spine, rule out fibromyalgia; lumbar scoliosis; morbid obesity; adjustment disorder with mixed depression; and anxiety (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4)   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
> (5)   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) limited to simple, routine tasks that do not require lifting more than ten pounds occasionally and less than ten pounds frequently; no standing/walking over aggregate of four hours per day; no sitting over approximately four hours per day; occasional stooping, balancing, crouching, kneeling, and climbing stairs/ramps; no crawling or climbing ladders, ropes, and scaffolds; a sit-stand option at 60 minutes; and no required exposure to unprotected heights, dangerous machinery, or uneven terrain.
>
> (6)   The claimant is unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7) The claimant was born on February 9, 1980, and was 30 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and 416.963).

(8) The claimant has at least a high school education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.969(a)).

(11) The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2011, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520, 416.920. If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work.  SSR 82–62, 1982 WL 31386, at *3.  The plaintiff bears the burden of establishing his inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).  He must make a prima facie showing of disability by showing he is unable to return to his past relevant work.  *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert.  *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  *Hays v. Sullivan*, 907 F.2d 1453, 1456

(4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence.  *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed.  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was treated by Brian Cline, M.D., at Lexington Family Practice during the relevant time period from April 21, 2010, to April 6, 2012 (Tr. 276-80, 370-78). Dr. Cline was her primary care physician.  On June 4, 2010, the plaintiff complained of fatigue and crying spells, and Dr. Cline opined that this was caused by depression (Tr. 280). He recommended that the plaintiff start taking Wellbutrin; however, the plaintiff never started this medication (Tr. 279-80).  When she returned to Dr. Cline in August 2010, the plaintiff's only medication was Synthroid and Adderall.  The plaintiff did not complain of depression at this visit, only back pain.  However, her straight leg raising test was negative, and her reflexes were normal.  Dr. Cline noted that the plaintiff's back x-ray showed scoliosis (Tr. 279).

On January 25, 2011, the plaintiff had joint pain, fatigue and trouble sleeping. There was a question of fibromyalgia or myasthenia gravis. She was taking Synthroid for hypothyroidism. She was assessed with joint pain and questionable fibromyalgia and prescribed Cymbalta (Tr. 251). On February 14, 2011, a CT of the plaintiff's head revealed right maxillary, ethmoid, and sphenoid sinusitis (Tr. 281).

On March 9, 2011, Dr. Cline indicated that both the plaintiff's fatigue and hypothyroidism were improved. The plaintiff indicated that she felt "80% better." Dr. Cline also noted that the plaintiff went to an ophthalmologist for an eye twitch and that fibromyalgia was "questionable" (Tr. 251). On March 11, 2011, the plaintiff underwent a total abdominal hysterectomy (Tr. 225). On May 17, 2011, the plaintiff again indicated that her pain was improved, but she complained of increased fatigue. The plaintiff said that she slept well during the night but was still tired during the day to the point she would fall asleep while sitting and talking to someone. Dr. Cline indicated that she was "questionable" for narcolepsy and recommended that she see Richard Bogan, M.D., Medical Director at Sleep Disorders Center (Tr. 251).

The plaintiff underwent a consultative examination with Thomas Motycka, M.D., on May 5, 2011. Dr. Motycka noted that the plaintiff at first said she was diagnosed with fibromyalgia four or five months ago. She then indicated that she had only been diagnosed two months ago. Finally, the plaintiff admitted that she had never been diagnosed with fibromyalgia and her doctors had only "considered" it. Dr. Motycka was very skeptical of the plaintiff's alleged fibromyalgia because it was first mentioned in her medical records by her family physician, Dr. Cline, when he noted that the plaintiff "saw her ophthalmologist and there was a question of fibromyalgia or myasthenia gravis." The plaintiff told Dr. Motycka that this notation by Dr. Cline stemmed from her single complaint of an eye twitch, which she seemed to believe was a symptom of fibromyalgia. When Dr. Motycka informed her that this is known as blepharospasm and has nothing to do with

fibromyalgia, the plaintiff then stated, "Oh, and I have pains everywhere and I sleep a lot." Dr. Motycka noted that it took the plaintiff "quite a while" before adding these additional alleged symptoms of fibromyalgia and further noted that it contradicted the plaintiff's complaints to her physician that she actually had trouble sleeping. Dr. Motycka also noted that this contradicted Dr. Cline's treatment notes from January 25, 2011, which indicated that the plaintiff's fibromyalgia was "questionable," and his notes on March 9, 2011, when Dr. Cline did not mention fibromyalgia at all, but actually found that the plaintiff's fatigue and hypothyroidism had improved (Tr. 240).

The plaintiff also told Dr. Motycka that she was taking Synthroid for hypothyroidism and her doctor was "continuously" raising her prescribed amount. Yet Dr. Motycka noted that the plaintiff's prescription for Synthroid remained unchanged for over a year and only recently was increased a small amount in March 2011. The plaintiff also indicated that she had chronic lower back pain, though she was vague about her symptoms and just said she was told she had scoliosis. Dr. Motycka noted that her radiologist report from August 10, 2010, said "slight scoliosis." Moreover, Dr. Motycka obtained a lumbar spine x-ray and found that it was essentially normal with a "very slight rotation" at L1, L2, and L3, which was indicative of "very small scoliosis" (Tr. 240-41).

Upon examination, the plaintiff had normal range of motion in her cervical spine, shoulders, elbows, wrists, knees, hips, and ankles. She also had normal extension and lateral flexion in her lumbar spine but could only forward flex 60 degrees. Dr. Motycka noted that she did not appear to put forth her best effort during forward flexion. Her straight leg-raising test in the sitting position was 90 degrees bilaterally with no discomfort and 45 degrees in the supine position with no discomfort. The plaintiff could tandem-walk, heel-walk, and toe-walk; she could squat; she ambulated without any gait disturbance; and she required no assistive device when walking. All of her muscle strength testing was +5/+5, her reflex testing was normal, and she could perform fine and gross manipulation. Dr.

Motycka found that the plaintiff does not have fibromyalgia, but she does have hypothyroidism for which she receives proper treatment (Tr. 243-44).

On May 24, 2011, Dr. Cline wrote that the plaintiff had scoliosis and fibromyalgia, and he felt that she was unable to work more than four hours a day (Tr. 275). On May 25, 2011, Dr. Cline filled out a check-box disability form and checked that the plaintiff was not able to work full-time as of April 1, 2011. Dr. Cline provided no explanation for this opinion (Tr. 277). Dr. Cline also filled a Medical Assessment check-box form on the plaintiff's behalf noting that she could lift ten pounds occasionally, less than ten pounds frequently; she could stand/walk four hours in an eight-hour day; sit four hours in an eight-hour day; she could sit for sixty minutes before having to stand or walk; and she could stand/walk for sixty minutes before having to sit. He also indicated that the plaintiff would not need to lie down at unpredictable intervals during an eight-hour workday. Dr. Cline also checked-off that the plaintiff could occasionally twist, stoop, crouch, and climb ladders or stairs, and she was not limited in her ability to reach, finger, handle, push, pull, or feel. When asked to provide medical findings to support his opinion, Dr. Cline provided no answers. Finally, when asked if the plaintiff was capable, despite her impairments, of consistently sustaining and persisting at work activity for an eight-hour day, five days a week, Dr. Cline answered, "At times, yes" (Tr. 397-99).

The plaintiff underwent a sleep study by Dr. Bogan at Sleep Disorders Center on June 6, 2011 (Tr. 294). Dr. Bogan found during the study that the plaintiff had snoring and Periodic Limb Movement Disorder ("PLMS") (Tr. 298). The plaintiff told Dr. Bogan that she had fibromyalgia and, based on this information, Dr. Bogan diagnosed her with comorbid insomnia (Tr. 292). Dr. Bogan recommended that the plaintiff take Mirapex to help her sleep and Horizant to address her restless leg syndrome (Tr. 291-92).

On June 16, 2011, State agency psychologist, Manhal Wieland, Ph.D., reviewed the plaintiff's medical records and opined that she had Affective Disorder

(depression), but that it was not a severe impairment (Tr. 252, 255). Dr. Wieland found that the plaintiff's depression only caused mild limitations in her activities of daily living, social functioning, and in maintaining concentration, persistence, or pace (Tr. 262). Dr. Wieland noted that the plaintiff's use of Cymbalta was helping her condition, and her primary care physician did not recommend any psychiatric care.[2] Dr. Wieland also noted that the plaintiff's primary care physician (Dr. Cline) indicated that she had work-related limitations, but Dr. Cline also noted that the plaintiff's mental status evaluation was normal, and the plaintiff never alleged disability due to any mental impairments (Tr. 264).

On July 5, 2011, State agency physician Warren Holland, M.D., reviewed the plaintiff's medical records and found that she could lift fifty pounds occasionally; lift twenty-five pounds frequently; stand/walk six hours in an eight-hour day; and sit six hours in an eight-hour day. He further opined that the plaintiff had no limitations in her ability push and/or pull; no postural limitations; no manipulative limitations; and no environmental limitations (Tr. 267-70).

On July 20, 2011, Dr. Cline noted that the plaintiff would be referred to Dr. Goeckritz for confirmation of the fibromyalgia diagnosis. She had myalgias and pain in her back, neck, shoulder, hip, and leg. The usual trigger points were noted. Dr. Cline opined that the plaintiff's back pain was not a surgical issue because her x-rays only showed mild scoliosis (Tr. 372).

On August 4, 2011, the plaintiff indicated that the Horizant significantly helped her restless leg syndrome but that she was still having difficulty sleeping because of her back and hip pain. Her only medication to treat this was Cymbalta and Tylenol (Tr. 290).

---

[2]Dr. Cline recommended mental health counseling for the plaintiff for the first time a few weeks after the second State agency expert opined that the plaintiff's mental health impairments were not severe (Tr. 355).

On September 12, 2011, Thomas E. Brandt, D.O., at Kershaw Health Medical Center, completed a pain evaluation form. The plaintiff presented with pain in her lower back, which radiated into her buttock and lateral thigh, into her knee and feet. She stated that the right side of her face became numb and it was hard to talk. She had pain in her neck, shoulder, and the back of her head. She had short term memory loss and her legs moved without warning during the day and night. She had numbness in her hands bilaterally and burning in her feet bilaterally. The plaintiff was very depressed and reported that bright lights hurt her eyes. She was unable to sleep. She had a slow, unstable, antalgic gait. Several trigger points were noted to be positive. Dr. Brandt assessed the plaintiff with multiple somatic complaints and lower lumbar pain, with a concern for a previous hyperextension injury. Dr. Brandt prescribed Requip for restless leg syndrome. Cervical spine x-rays showed some possible muscle spasm and minimal degenerative disc disease changes at C5-6 (Tr. 302-310).

On September 22, 2011, the plaintiff saw Dean Troyer, M.D., and underwent EMG, motor nerve, and sensory nerve studies, which showed no evidence of peripheral nerve impingement, peripheral polyneuropathy, or radiculopathy (Tr. 311-13).

On October 14, 2011, the plaintiff was seen by Dr. Cline for fibromyalgia. She was depressed and sleeping all the time. She had a sleep study, which showed restless legs, and she was on medication for it. She was on Cymbalta for her fibromyalgia and on Synthroid 124, but she still felt washed out, tired, and was sleeping all the time. Dr. Cline felt it was more than depression and augmented her medications with Nuvigil (Tr. 405).

On November 1, 2011, State agency psychologist, Janet Boland, Ph.D., reviewed the plaintiff's medical records and concurred with Dr. Wieland's findings that the plaintiff's depression was not severe (Tr. 333). On November 17, 2011, State agency physician Robert Kukla, M.D., also reviewed the plaintiff's medical records and concurred with Dr. Holland's findings of July 5, 2011, except he opined the plaintiff could never climb

ladders and could frequently balance, stoop, kneel crouch, crawl, and climb ramps/stairs (Tr. 348-54)

The plaintiff met with a mental health counselor on November 28, 2011, for an initial evaluation. Melissa Tuten, LPC, at Post Trauma Resources, evaluated the plaintiff at Dr. Cline's request for her depression. The plaintiff told Ms. Tuten that she cannot work due to her "fibromyalgia and pain." For the first time, the plaintiff indicated that she had "social anxiety" (Tr. 355). Ms. Tuten noted that the plaintiff was neatly dressed and well-groomed; she was oriented in all spheres; her mood was depressed, but she was alert; and she demonstrated good eye contact and coherent, logical, goal-directed speech. The plaintiff's remote and recent memory was not impaired, and her thought content was appropriate. The plaintiff's judgment was good, and she was able to maintain normal concentration and attention. Ms. Tuten described the plaintiff's demeanor as cooperative and interested (Tr. 356). Ms. Tuten diagnosed the plaintiff with Major Depressive Disorder (single episode, mild, chronic) and Adjustment Disorder with mixed anxiety and depressed mood (chronic) (Tr. 355). She assessed the plaintiff's Global Assessment Functioning ("GAF") score at 58[3] and recommended that the plaintiff start relaxation exercises (Tr. 357). The plaintiff received counseling from Ms. Tuten once on December 6, 2011, but then she missed her next two scheduled appointments on December 27, 2011, and June 4, 2012 (Tr. 415-16, 436). The plaintiff did not see Ms. Tuten again until September 25, 2012. At that time, the plaintiff was still concerned about her decreased energy, yet she indicated that she was now volunteering at her child's school for an hour at a time. The plaintiff also

---

[3] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.*

11

indicated that her Cymbalta medication remained unchanged (Tr. 437). This was the plaintiff's last session with Ms. Tuten.

On January 30, 2012, the plaintiff was seen by Dr. Cline for musculoskeletal neck pain (Tr. 407).

The plaintiff underwent a psychiatric evaluation with S. Rao, M.D., at Capital Brain Center on March 9, 2012 (Tr. 359). She indicated a myriad of mental issues, including "daily" panic attacks and what she thought was bipolar syndrome (Tr. 360-61). Dr. Rao noted that the plaintiff was cooperative, appropriately dressed, and demonstrated normal motor activity. The plaintiff's speech rate, rhythm, and tone were all normal; her thought content was normal; her thought process was linear; her insight and judgment were fair; she was oriented to all spheres; and her affect was appropriate. The evaluating physician diagnosed the plaintiff with major depressive disorder with panic attacks, fibromyalgia, and restless leg syndrome. Dr. Rao assessed her GAF score at 59 and recommended that she start taking 100mg of Wellbutrin per day (Tr. 364). The plaintiff did not seek any further treatment at Capital Brain Center.

On April 6, 2012, an MRI of the plaintiff's lumbar spine showed only mild changes of disc desiccation without disc narrowing at L5-S1 (Tr. 439, 379). There was evidence of a shallow broad-based central disc herniation with a mild diffuse symmetric circumferential bulge of the annulus. However, there was no root sleeve effacement, no significant central or foraminal stenosis, and no degenerative facet changes or pars defects. Additionally, the retroperitoneal and surrounding paraspinal soft tissues were all normal (Tr. 373).

John Parrott, M.D., at Orthopedics and Spine Surgeons of South Carolina evaluated the plaintiff on May 17, 2012, and opined that the plaintiff was not a good surgical candidate. Dr. Parrot diagnosed her with symptomatic disk degeneration at L5-S1, obesity, history of pain syndrome, and fibromyalgia. Dr. Parrott recommended "continued

conservative care" and advised the plaintiff to seek physical therapy and pain management (Tr. 379-80).

Dr. Cline requested that Dr. Nicholas A. Lind, Psy.D.,[4] evaluate the plaintiff. On May 8, 2012, Dr. Lind issued his report based on his psychological evaluation of the plaintiff on March 30, 2012. Dr. Lind noted that the plaintiff's eye contact was good; her speech was logical, coherent, and goal directed; her memory was not impaired; and she had a negligible degree of conceptual disorganization. The plaintiff's insight and judgment were good, but she demonstrated a limited ability to attend and maintain focus. However, Dr. Lind indicated that the plaintiff put forth minimal effort at the outset of the testing, and one of her tests revealed malingering. Additionally, during the plaintiff's attention testing, Dr. Lind suspected she was not putting forth her best effort and warned her that her test scores would be invalidated. The plaintiff then improved her attention score from zero out of ten, to four out of ten. She also incorrectly told Dr. Lind that she had been in therapy for over a year and a half. Dr. Lind assessed the plaintiff's GAF at 49 and advised her to continue psychiatric treatment.[5] Dr. Lind stated that he was aware the plaintiff was seeking disability and opined that she "meets the criteria for listing 12.04. In particular, she evidences anhedonia, appetite disturbance, sleep disturbance, agitation, decreased energy and difficulty concentrating. These difficulties have resulted in restricted social activities and difficulties maintaining her concentration" (Tr. 421-26; *see also* Tr. 417). Dr. Lind met with the plaintiff on May 23, 2012, to give her feedback on her testing. At that time, the plaintiff was well-oriented and alert with appropriate affect and depressed mood. The

---

[4] It appears that Dr. Lind works at Post Trauma Resources where the plaintiff had two counseling sessions with Ms. Tuten (Tr. 421). However, Dr. Lind never personally treated the plaintiff.

[5] As noted above, the plaintiff sought mental health treatment four months before her evaluation with Dr. Lind (Tr. 355). She had one counseling session with Ms. Tuten after her evaluation with Dr. Lind (Tr. 437).

13

plaintiff's memory was unimpaired, judgment and insight were good, and she was able to attend and maintain focus. Dr. Lind stated that the plaintiff's cognitive testing was not valid due to apparent lack of effort, but her self-report of pain and emotional distress were valid due to the consistency with the psychological testing (Tr. 417).

On May 24, 2012, Dr. Cline opined that the plaintiff could lift and carry ten pounds occasionally and less than ten pounds frequently. She could walk and stand for four hours and sit for a maximum of four hours. She could sit, walk, or stand for sixty minutes before she would need to change position. She could occasionally twist, stoop, crouch, climb stairs, or climb ladders. Dr. Cline wrote that "at times" the plaintiff was capable of consistently sustaining and persisting at work activity for an eight-hour day, five days per week (Tr. 396-99).

On May 23, 2012, Dr. Lind wrote again that the plaintiff's condition met Listing 12.04 (Affective Disorders). Dr. Lind opined that the cognitive testing was not valid due to apparent lack of effort. Her self-report of pain and emotional distress were determined to be valid because of the consistency with the psychological testing, which was determined to be valid. She was diagnosed with major depressive disorder, adjustment disorder with mixed anxiety and depressed mood, fibromyalgia, scoliosis, and chronic pain. Her GAF was 58, and her mood was depressed. Her prognosis was poor. Her thought process was distractible, her mood was flat, and her attention/concentrations was poor. She was markedly limited in her ability to: remember locations and work-like procedures, understand, remember, and carry out long and detailed instructions, maintain attention and concentration for extended periods of time, work in coordination with or proximity to others without being distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and set realistic goals or make plans

independently of others. In Dr. Lind's professional opinion, the plaintiff was not capable of sustaining and persisting at work activity for an eight-hour day, five days per week (Tr. 381-85).

On October 4, 2012, the plaintiff was seen for perioral paresthesias and right arm paresthesias. Her right arm went numb, and her speech became impaired. Subsequently, she had a left-sided headache. She had experienced the symptoms twice previously, but had not reported them. She had chronic fibromyalgia complaints as well (Tr. 567-68).

On January 14, 2013, the plaintiff had upper abdomen pain, right wrist pain, left toe pain, bilateral hip pain, and right sided lower chest wall pain. Dr. Cline assessed the plaintiff with chest pain, abdominal pain, and fibromyalgia. He told the plaintiff to stop taking Mobic and start taking Diclofenac (Tr. 570-573).

*Administrative Hearing*

The plaintiff was 32 years old at the time of the hearing. She had been married for over ten years and lived with her husband and three school-age children (Tr. 35-36, 363). The plaintiff taught Sunday school at her church and also volunteered an hour a day at her child's school (Tr. 357). The plaintiff graduated from high school and obtained cosmetology training afterwards (Tr. 36). She taught cosmetology for a couple of years and was a gymnastics instructor before that (Tr. 37, 44). She had a driver's license, and she drove her kids to and from school every day (Tr. 39). She also drove herself to the administrative hearing. The plaintiff went to her doctors' offices, church, and visited family and friends on a regular basis. She could shower, dress, and attend to her personal care without assistance. She also helped her husband with the cooking at night, but was able to prepare lunch by herself during the day (Tr. 39-41). The plaintiff was also able to grocery shop with her children, do laundry, do the dishes, mop, sweep, vacuum, and clean the bathrooms (Tr. 41-42). The plaintiff did have her children help out around the house (Tr.

41). The plaintiff admitted that, while her doctors recommended that she exercise and walk to help relieve her symptoms, she did not do so (Tr. 47). She also indicated that she could only walk ten minutes before needing to rest; she could only sit ten minutes before needing to stand; and she could only lift ten pounds (Tr. 48-49)

The ALJ asked the vocational expert to assume a person of the plaintiff's age, education, and vocational background, who could do sedentary work, but was limited to simple, routine, repetitive tasks that required lifting no more than ten pounds frequently; no standing/walking more than four hours in an eight-hour day; no sitting more than four hours in an eight-hour day; only occasional stooping, balancing, crouching, kneeling, and climbing ramps and stairs; no crawling or climbing ladders, ropes, and scaffolds; no exposure to unprotected heights, dangerous machinery, or uneven terrain; and with a sit-stand option every sixty minutes (Tr. 74-75). The vocational expert testified that such a person could perform jobs existing in significant numbers in the national economy, including the sedentary unskilled representative occupations of machine tender and assembler (Tr. 71-72, 74-75).

## **ANALYSIS**

The plaintiff argues that the ALJ erred by (1) failing to properly evaluate her mental impairments;(2) failing to consider her severe impairment of chronic fatigue; (3) failing to address Dr. Cline's opinion that she may not be able to sustain gainful work on an ongoing basis; and (4) failing to acknowledge conflicts between the *Dictionary of Occupational Titles* ("*DOT*") and the vocational expert testimony in that the plaintiff's residual functional capacity ("RFC") did not allow her to perform the sitting generally required of sedentary work and unskilled, sedentary occupations generally cannot be performed with the need for a sit/stand option (pl. brief at 21-34).

The plaintiff first argues that the ALJ failed to properly consider her mental impairments in the RFC assessment (pl. brief at 22-26). Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraph (b), (c), and (d) of 20 C.F.R. §§ 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional level of work, sedentary, light, medium, heavy and very heavy.

SSR 96-8p, 1996 WL 374184, at *1.  The ruling further provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*  Moreover, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

The ALJ found that the plaintiff had severe mental impairments of adjustment disorder with mixed depression and anxiety, along with several severe physical impairments (Tr. 14). In the RFC assessment, the ALJ limited the plaintiff to simple, routine tasks (Tr. 16). In making the RFC assessment, the ALJ noted that the plaintiff did not allege any

17

mental impairments initially, she was treated for depression with medications prescribed by Dr. Cline, examinations showed she was alert and oriented, and she "is not receiving any psychiatric or mental health treatment" (Tr. 19; *see also* Tr. 17). The plaintiff contends that the statement that she was not receiving mental health treatment was in error because she received counseling at Post Trauma Resources on two occasions (*see* Tr. 355-56, 415-16, 436-38) and Dr. Rao at Capital Brain Center diagnosed her with major depressive disorder with panic attacks (Tr. 359-64). The Commissioner argues this was not error because *at the time the ALJ rendered his opinion* in January 2013 the plaintiff was not receiving mental health treatment as she had not received counseling since her last session with Ms. Tuten in September 2012 (def. brief at 15).

The plaintiff further argues that the RFC assessment is lacking because the ALJ failed to consider or discuss Dr. Lind's evaluation of her mental impairments. As set forth more fully above, Dr. Lind found that the plaintiff "meets the criteria for listing 12.04. In particular, she evidences anhedonia, appetite disturbance, sleep disturbance, agitation, decreased energy and difficulty concentrating. These difficulties have resulted in restricted social activities and difficulties maintaining her concentration" (Tr. 417). The Commissioner argues that the ALJ was not required to cite to every piece of evidence in the record and there are numerous reasons for discounting Dr. Lind's opinion, including that Dr. Lind was not a treating physician, he found evidence of malingering during the plaintiff's testing, the cognitive testing was not valid due to apparent lack of effort, his opinion was unsupported by his own clinical observations and the observations of Ms. Tuten, and the determination of whether the plaintiff was able to work was for the ALJ and not Dr. Lind (def. brief at 16-18 (citing Tr. 356, 417, 421-26)).

While clearly there may be valid reasons for discounting Dr. Lind's opinion, the Commissioner's arguments are *post-hoc* rationalization not included in the decision. *See Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003) ("[G]eneral principles of

18

administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ."). Without an explanation of the ALJ's consideration of this evidence, this court cannot determine whether the RFC assessment was based upon substantial evidence. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (citations omitted). Because the court finds the ALJ's failure to consider this evidence regarding the plaintiff's mental impairments is a sufficient basis to remand the case to the Commissioner, the court declines to specifically address the plaintiff's other allegations of error by the ALJ. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). However, upon remand, the Commissioner should take into consideration the plaintiff's remaining allegations of error: the ALJ failed to consider her chronic fatigue; failed to address Dr. Cline's opinion that she may not be able to sustain gainful work on an ongoing basis; and failed to acknowledge that the vocational expert's testimony conflicted with the *DOT* because the plaintiff's RFC did not allow her to perform the sitting generally required of sedentary work and unskilled, sedentary occupations generally cannot be performed with the need for a sit/stand option.

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, this court recommends that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

June 17, 2015
Greenville, South Carolina